CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
March 08, 2024
LAURA A. AUSTIN, CLERK
BY: /s/T. Taylor
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| VITO ANTONIO HOEHN,<br>n/k/a VITO ANTONIO FALATO,[1]<br>　　Plaintiff, | )<br>)<br>) | Civil Action No. 7:22-cv-00194 |
| v. | )<br>)<br>) | MEMORANDUM OPINION |
| J. GIBSON,<br>　　Defendant. | )<br>)<br>)<br>) | By: Joel C. Hoppe<br>　United States Magistrate Judge |

This civil rights case pursuant to 42 U.S.C. § 1983 was filed by Vito Antonio Hoehn, now known as Vito Antonio Falato, proceeding *pro se*. Plaintiff's allegations arise from when he was a prisoner in the custody of the Virginia Department of Corrections. He has since been released and granted leave to proceed *in forma pauperis*. ECF No. 63. The parties consented to jurisdiction before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). ECF Nos. 23, 24.

By memorandum opinion and order entered March 16, 2023, the court granted in part and denied in part defendants' motion to dismiss, leaving in the case only an Eighth Amendment conditions of confinement claim against a single defendant, J. Gibson. ECF Nos. 30, 31. Plaintiff alleges that the denial of outdoor recreation activities and the ability to exercise outside of his cell during his incarceration was unconstitutional. Now before the court are cross-motions for summary judgment. ECF Nos. 40, 53. Gibson's motion will be granted, plaintiff's motion will be denied, and this matter will be dismissed in its entirety.

I. BACKGROUND

**A. Red Onion State Prison**

---

[1] Plaintiff filed a notice of a name change and a court order granting the same. ECF No. 45.

Falato was a prisoner in the custody of the VDOC, housed at Red Onion State Prison. ECF No. 1. Gibson was the Unit Manager of Red Onion's D Building from December 10, 2021, through November 9, 2022. Gibson Decl. ¶ 1, ECF No. 48-2. Plaintiff was housed in the D Building from December 31, 2021, through April 4, 2022, and from May 17, 2022, through June 13, 2023. Gibson Decl. ¶ 11. Plaintiff had a classification of Security Level 6 Re-Entry Phase II. He was a high-security inmate approaching his release date. *Id.* ¶ 10.

**B. Security**

VDOC has six security levels and Security Level S. Level 1 is minimum security and Level 6 is maximum security. Level 6 inmates may participate in a step-down program that affords them increasing privileges as they prove themselves to be less of a danger to themselves and others. Gibson Decl. ¶ 7. Classification as a Re-Entry inmate is time-based, not based on the person's progress. Level 6 Re-Entry inmates are Level 6 inmates who have not progressed to lower-level security classification and who are due to be released from prison within 24 months. Because of their high security level and imminent release, these inmates receive re-entry programming within a Level 6 security environment. *Id*.

As Unit Manager at Red Onion, Gibson monitored and maintained security and control of the D Building. Gibson Decl. ¶ 4. The D Building housed inmates classified as Security Level 6. A high degree of physical restraint and supervision is required to maintain adequate control over inmates classified as Security Level 6 to prevent escapes, to minimize risk of staff and inmate injury, and to maintain orderly institution operations while providing for public safety. *Id.* ¶ 5.

The D Building is comprised of six housing pods, D-1 through D-6. Each pod has an upper and lower tier, with common areas, kiosks, and telephones on the lower tier. Portable phones are also available for in-cell use during specified times and for use at tables during pod

recreation. *Id.* ¶ 6. Falato's phone records show that he placed almost 700 calls during the nine-month period between January 2, 2022, and September 30, 2022, a period that includes over a month when plaintiff was housed elsewhere. Zidar Decl. Encl. A, ECF No. 48-3. The cells in the D Building were large enough that a person could exercise. Plaintiff jogged in his cell. Gibson Decl. ¶ 9.

**C. Recreation and Exercise**

During recreation time, Re-Entry inmates could use the kiosk at their secure chair and use a cordless or rolling telephone. When seated at a secure chair, an inmates' ankles were secured, but they could move their arms freely, stand up, and touch an inmate seated at a neighboring secured chair. Re-entry Level 6 Phase II inmates, including plaintiff, were allowed to walk unrestrained, one at a time, to and from the showers during the designated shower time. The inmates, one at a time, were allowed to walk unrestrained within the pod when no other inmates were present. Gibson Decl. ¶¶ 13, 23, 38.

Recreation modules, referred to as interior recreation modules, were located outside along the interior wall of the D Building. D Building also had two outside recreation areas where qualified inmates could move unrestrained. *Id.* ¶ 6. Inmate security classification and status determines whether the inmate is allowed recreation in the outside area unrestrained or required to take outdoor recreation in the interior recreation modules. *Id.* ¶ 7. Except for the Level 6 Re-Entry inmates, such as plaintiff, all inmates in D Building were eligible to participate in unrestrained outdoor recreation. *Id.* ¶ 8. Because of their security classification and pursuant to VDOC policy, such inmates were not allowed unrestrained outdoor recreation. Instead, they were required to take outside recreation in the interior recreation modules. *Id.* ¶ 8.

Gibson did not create VDOC's policy prohibiting Level 6 Re-Entry inmates from having unrestrained outdoor recreation, and he did not have the ability to change that policy. *Id.* ¶ 39. Similarly, Gibson did not have the power or authority to allow Level 6 Re-Entry inmates to participate in unrestrained outdoor recreation, and he did not have the ability to offer the inmates outdoor recreation outside of the recreation modules. Nor did Gibson have authority to implement a proposal or adopt an alternative that would have allowed the inmates to participate in unrestrained outside recreation. *Id.* ¶¶ 8, 25, 39.

**D. Construction**

Beginning in the summer of 2021, the D Building was undergoing numerous repairs and refurbishments, including roof repairs. During this time, non-VDOC contractors, equipment, or both were on the roof of D Building throughout the day. *Id.* ¶ 14. Equipment and personnel frequently moved from one side of the roof to the other on walkways above the interior recreation modules. Materials and tools falling risked harming anyone in the recreation areas, and the presence of non-VDOC construction workers on the roof or walkway while inmates were outside below them would have posed a security risk to inmates, staff, the contract workers, and the prison itself. As such, when outside personnel and equipment were on the roof, the interior recreation modules could not be used. *Id.* ¶ 15.

Security Level 6 Re-Entry inmates were usually housed in the D-2 Pod, but for part of 2022, they were housed in the D-4 Pod because of construction on the D Building. The D Building also housed inmates in other programs: Secure Allied Management, Secured Integrated Pod, and Level 6 Step Down I and II programs. For security reasons, inmates of one status were not allowed to mix with those of another status. Also, keep-separate inmates were not allowed contact with each other. For example, because plaintiff had assaulted another inmate, he and the

other inmate, who was also housed in Building D, had to be kept separate, and under normal conditions the two would not be housed in the same pod. *Id.* ¶ 12.

Despite the construction, inmates in the D Building were allowed to shower on a regular basis, talk on the phone daily, communicate by email daily, and use the kiosk daily when possible. *Id.* ¶ 38. Gibson did not have the ability to control the timing or implementation of the construction projects. *Id.* ¶ 39.

**E. COVID Outbreaks**

From December 29, 2021, through September 22, 2022, Red Onion experienced five COVID outbreaks: (1) December 29, 2021, to February 18, 2022; (2) March 3 to 28; (3) June 2 to 16; (4) July 2 to 21; and (5) August 24 to September 22. These outbreaks affected housing and operations at the D Building. *Id.* ¶ 16.

When an inmate tested positive for COVID at Red Onion, an Incident Command System was initiated. Inmates who tested positive for COVID or refused to be tested but showed symptoms of COVID were quarantined into designated RED zones, either in specified cells in medical or in specified areas of a housing unit. Inmates who contacted someone who had tested positive for COVID or who had been transported outside of the prison where they may have come into close contact with an infected person were isolated in a YELLOW zone. *Id.* ¶ 17.

There were two negative pressure cells in Red Onion's medical unit where infected inmates could be housed. When there were more than two inmates infected at a time, a pod in the D Building was turned into a RED zone. The process of setting aside a RED zone happened very quickly; Gibson was told to create a RED zone, and he and his officers immediately went to the designated pod, told the inmates they were moving, and moved the inmates to a different pod. Because of the constant designation of RED and YELLOW zones and the construction, instead

5

of working with the usual 6 pods in Building D, inmates in the D Building were often housed in one or two pods. *Id.* ¶ 18.

Once no one was infected and a RED zone had been cleared by the Safety Officer or other qualified staff, its status was reported to VDOC, and the pod was disinfected by trained staff. Because the cleaning process took time and was performed by a limited staff, a lag occurred between the clearing of a RED zone and the re-occupation of the pod. *Id.* ¶ 19.

**F. First COVID Outbreak**

As noted, the first COVID outbreak at Red Onion began in December 29, 2021, and lasted through February 18, 2022. *Id.* ¶ 16.  On December 30, 2021, the D-2 Pod was designated a RED zone, and the D-3 Pod was designated a YELLOW zone. *Id.* ¶ 20.

On January 3, 2022, all non-infected and non-exposed inmates in the D Building were moved into the D-1 Pod because another RED zone had to be opened in the D-3 Pod. This meant that inmates of different statuses lived in the same pod. Schedules were established to avoid mixing inmates of different statuses. *Id.* ¶ 21.

For the entire prison, Red Onion's Chief of Housing and Programs (CHaP) required that only half of a tier of inmates (instead of the whole upper or lower tier) participate in recreation at a time, with each half tier having recreation for an hour during dayshift and thirty minutes during night shift. The CHaP discontinued outside recreation for everyone. As ordered by the CHaP, pod-to-pod and building movement was to be limited as much as possible and masks were to be worn by inmates and staff. *Id.* ¶ 22. Despite these limitations, Level 6 Re-Entry inmates were allowed a minimum of one hour of out-of-cell time, regular showers, and the opportunity to use the kiosk and make phone calls seven days a week. These inmates were allowed to walk unrestrained within the pod, one at a time, so long as no other inmates were present. *Id.* ¶ 23.

Because of the construction on Building D, the interior recreation pods could not be used for outdoor recreation for the Re-Entry inmates. *Id.* ¶¶ 14–15.

On February 10, 2022, the CHaP's prohibition on outside recreation was lifted. Because some of the inmates who had been using the pod for recreation could now be placed outside, Building D had an additional hour in which the pod could be used for Re-Entry inmate recreation. Gibson increased the amount of out-of-cell recreation for Re-Entry inmates to a minimum of two hours. *Id.* ¶ 24.

During this COVID outbreak, Gibson discussed other options with officers and Red Onion's CHaP for providing Level 6 Re-Entry outside recreation. The CHaP circulated a proposal to give such inmates outside group recreation instead of individual recreation in modules. The proposal would allow five inmates at a time to use the outside recreation yard. The staff and inmates in D Building were trying to get time for outside recreation but allowing high-security inmates who had not proven themselves to be around staff and each other presented security issues. Gibson and others wanted outside recreation time for Re-Entry inmates. *Id.* ¶ 25.

On February 18, after the first COVID outbreak stopped and the pods had been cleaned, the Re-Entry inmates were returned to the D-2 Pod. *Id.* ¶ 25.

**G. Second COVID Outbreak**

Red Onion experienced another COVID outbreak beginning on March 3 and lasting through March 28. *Id.* ¶ 16. Beginning on March 7 and continuing until March 25, the D-3 Pod was designated a RED zone. Plaintiff was moved to the D-1 Pod. *Id.* ¶ 28. Because of the ongoing construction, the interior recreation pods still could not be used for outdoor recreation for the Re-Entry inmates. *Id.* ¶¶ 14–15.

**H. Move to the C Building**

From April 4 to May 17, plaintiff was housed in RHU in the C Building because of a disciplinary offense. *Id.* ¶ 29. Plaintiff initiated this lawsuit during that period.

By the time he returned to the D Building, one side of the construction had been completed, but there were still tools, construction materials, and non-VDOC contractors on the roof and walking across the space of the interior modules. The interior recreation modules still could not be used because of the risk involved. At this time, Level 6 Re-Entry inmates were allowed a minimum of four hours of in-pod recreation and an additional two hours of out-of-cell time for educational programming in the D-4 pod. *Id.* ¶ 30.

**I. Third COVID Outbreak**

From June 2 to June 16, Red Onion experienced another COVID outbreak. *Id.* ¶ 16. On June 3, the D-5 Pod was designated a RED zone, and on June 6, the D-4 pod was also designated a RED zone. On June 6, Falato and all the other non-infected Re-Entry inmates were moved from the D-4 Pod to the D-6 Pod. There were no secure chairs in the D-6 Pod. Because Re-Entry inmates were not allowed to be around one another without restraints, Gibson instructed officers to give Re-Entry inmates a phone at any time and showers upon request as much as possible. *Id.* ¶ 31.

Gibson continued to try to find a way for the Re-Entry inmates to have outside recreation. On June 7, he emailed Red Onion's Warden, Chief of Security, and the CHaP to "see if there was any progress on the proposal for level 6 Re-Entry to be able to have outside recreation unrestrained." Gibson understood that the proposal still had not received the required security approvals. Without the approvals of high-ranking VDOC officials, Gibson could not implement the proposal. *Id.* ¶ 32.[2]

---

[2] On July 6, 2022, anticipating approval of the proposal for Level 6 Re-Entry unrestrained outside recreation, Gibson provided the CHaP and Red Onion's Operations Manager a schedule setting two hours of

On June 16, the zone restrictions were lifted because there were no positive cases of COVID. The pods were cleaned, and plaintiff returned to the D-4 Pod on June 17. *Id.* ¶ 33.

**J. Fourth COVID Outbreak**

There was another COVID outbreak from July 2 to July 21. *Id.* ¶ 16. D-4 Pod was designated a RED zone from July 12 until July 21. Plaintiff and the other Re-Entry inmates were moved from D-4 to D-5 and returned to D-4 on July 22. Once again, because D-5 did not have secure chairs, Gibson instructed officers to give Re-Entry inmates a phone at any time and showers upon request as much as possible. *Id.* ¶ 35.

Because of the ongoing construction on Building D, the interior recreation pod still could not be used for outdoor recreation for the Re-Entry inmates. *Id.* ¶¶ 14–15. Re-Entry inmates were again allowed four hours of morning recreation outside of their cells beginning on July 22. *Id.* ¶ 35.

**K. Resuming Use of Recreation Modules**

By August 29, 2022, construction on the D Building was completed. Re-Entry inmates were moved from D-4 back to D-2 when the pod was cleaned. Gibson scheduled Level 6 Re-Entry inmates two hours of outside recreation per day, but the inmates wanted four hours of outside recreation. Upon the inmates' request, Gibson set aside four morning hours, from 7:00 to 11:00 a.m., for their outside recreation in the interior recreation modules. *Id.* ¶ 36.

**L. Fifth COVID Outbreak**

Beginning on August 4 and continuing through September 22, Red Onion experienced another COVID outbreak. *Id.* ¶ 16. This outbreak did not prevent the Re-Entry inmates from having outside recreation because of the completed construction. *Id.* ¶ 37.

---

unrestrained outside recreation for Level 6 Re-Entry. Gibson Decl. ¶ 34. The proposal was not accepted because a more detailed proposal was required. *Id.*

**M. Plaintiff's Mental Health Issues**

On February 25, 2022, plaintiff reported to his psychiatrist as stable, not depressed, tolerating his medications, and feeling better between psychiatry visits. His mood was good. Sloan Decl. Encl. A, ECF No. 48-4.

Soon after, on February 28, Falato started working as a barber for the bottom tier of the D-2 Pod. Plaintiff was allowed to move outside his cell. His ankles were in restraints, but he was able to walk, and his wrists were not restrained. *Id.* ¶ 27.

Three months later, plaintiff reported as stable and tolerating his medications; his mood was OK. At his request, plaintiff's medications, Lithium ER, Strattera, Levothyroxine, and his Vitamin D supplement, were discontinued by his psychiatrist. Sloan Decl. Encl. A.

On August 6, plaintiff reported that he was not taking medication, he was stable, functioning well, and not depressed. His mood was good. *Id.* On September 23, plaintiff reported that he wanted to resume medication therapy for bipolar disorder and ADHD. His mood was OK. The psychiatrist recommended that he resume taking Lithium ER and Straterra. *Id.* On December 22, plaintiff reported that he was stable and tolerating his medications. According to plaintiff, the medications helped him and he was not depressed. His functioning was adequate, and his mood was good. *Id.*

The next year, on March 23, plaintiff told his psychiatrist that he was having favorable results from his medications and he wanted to take them in the evening because he was not a morning person. His mood was still OK. *Id.*

**N. Grievance and Grievance Procedures**

VDOC's administrative process for resolving offender issues and complaints in response to complaints and grievances is governed by Operating Procedure 866.1. Villbrandt Decl. ¶ 4,

ECF No. 48-1. Under OP 866.1, inmates must exhaust administrative processes prior to filing lawsuits concerning conditions of incarceration. The exhaustion requirement is met only when a Regular Grievance has been accepted into the grievance process and appealed, without a satisfactory resolution of the issue. An inmate must exhaust all the requirements of VDOC's Grievance Procedure before he can seek judicial relief. *Id.* ¶ 5.

Regular Grievances must be submitted within 30 calendar days from the incident. Prior to submitting a Regular Grievance, the inmate must demonstrate that he has made an effort to informally resolve his complaint. This may be accomplished by submitted an Informal Complaint or Written Complaint form to the Grievance Department, and then it is forwarded to the appropriate person for a response. If the inmate is dissatisfied with the response to the Informal Complaint, he may submit a Regular Grievance on the issue. *Id.* ¶ 8. Grievances that do not meet the filing requirements of OP 866.1 should be returned to the inmate within two working days from the date of receipt noting the reason for return on the intake section. Rejection of a grievance at intake may be appealed to the Regional Ombudsman. There is no further review. *Id.* ¶ 9. Ultimately, the exhaustion requirement is only met when a Regular Grievance has been accepted into the grievance process and appealed without satisfactory resolution of the issue.

On February 15, 2022, Red Onion's grievance department received an Informal Complaint from plaintiff. It was assigned number ROSP-22-INF-0246. *Id.* ¶ 10 Encl. B. In this complaint, plaintiff complained that "Re-entry inmates are not being offered any type of <u>OUTSIDE</u> recreation, whereas other inmates of the same or more and/or less than security level as [plaintiff] all receive outside recreation." *Id.*  Gibson responded to the informal complaint by stating that "the facility at ROSP was under modified movement to lower and reduce the spread

of an outbreak of COVID 19." Gibson's response further stated: "You are being offered the maximum amount of out of cell time that can safely be offered. As of 2-24-22, you are being offered 4–5 hours out of cell time per day every day." *Id.* ¶ 11.

On March 4, 2022, Red Onion's grievance department received a Regular Grievance from plaintiff, complaining that he was not satisfied with the response to ROSP-22-INF-0246 because it did not "address the issue of <u>WHY</u> re-entry inmates are not being offered <u>OUTSIDE</u> recreation." (Emphasis in original.) As relief, plaintiff requested that he and other re-entry inmates be offered "some form of outside recreation as part of our out of cell time." The Regular Grievance did not include any complaint about an inability for plaintiff to exercise outside of his cell. *Id.* ¶ 12. The Regular Grievance was not accepted at intake because it was deemed a request for services. The Institutional Ombudsman explained that plaintiff had been afforded the maximum amount of time considering the COVID 19 outbreak and that he was "now back to normal operation." *Id.* ¶ 13. Falato appealed the intake decision rejecting his Regular Grievance to the regional ombudsman, but the rejection was upheld on March 10, 2022. *Id.* ¶ 14. Plaintiff did not attempt to correct the defects of his Regular Grievance based on ROSP-22-INF-0246, nor did he submit a subsequent informal complaint or grievance about denial of access to outside recreation after COVID restrictions had been lifted. *Id.*

According to C. Vilbrandt, the Red Onion Grievance Coordinator, for the period following January 3, 2022, there was no informal complaint other than ROSP-22-INF-0246, and no grievances accepted at intake in which plaintiff complained that he was denied access to outside recreation. *Id.* ¶¶ 1, 15. The grievance department never received an informal complaint or grievance from plaintiff complaining that he was denied an ability to exercise outside of his cell. *Id.* ¶ 15.

During this time, plaintiff filed grievances related to other issues. For example, on January 18, 2022, the grievance department received an informal complaint, ROSP-22-INF-00100, from plaintiff complaining that items had not been included in his religious diet meals. He escalated the complaint by filing a Regular Grievance, ROSP-22-REG-00033, which he then appealed through Level II. On March 5, 2022, the regional ombudsman found that the grievance was unfounded. The Level II response stated that plaintiff had "exhausted all remedies." *Id.* ¶ 16.

## II. ANALYSIS

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating

13

there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25. Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

When parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserve judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, when "considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* The court must also abide by its affirmative obligation to prevent factually unsupported claims and defense from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

The court is further charged with liberally construing complaints filed by *pro se* litigants, to allow them to fully develop potentially meritorious cases. *See Cruz v. Beto*, 405 U.S. 319 (1972); *Haines v. Kerner*, 404 U.S. 519 (1972). At the summary judgment stage, however, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. *See Chisolm v. Moultrie*, C/A No. 4:21-03506-BHH-TER, 2023 WL 3631798, at *1 (D.S.C. May 2, 2023). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

**B. Defendant's Motion for Summary Judgment**

    **1. Exhaustion under the Prison Litigation Reform Act (PLRA)**

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). A prisoner must exhaust all available administrative remedies, whether or not they meet federal standards or are plain, speedy, or effective, and even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks. *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005).

Ordinarily, an inmate must follow the required procedural steps to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). An inmate's failure to follow the required procedures of the prison administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Exhaustion serves "two main purposes." *Woodford*, 548 U.S. at 89. First, the exhaustion requirement "protects administrative agency authority" by allowing the agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Id.* Second, "exhaustion promotes efficiency" because "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.* But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Shipp v. Punturi*, Civil Action No. 7:21cv00414, 2023 WL 7125259, at *3 (W.D. Va. Oct. 30, 2023) (citing *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)). Accordingly, an inmate need only exhaust

"available" remedies. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

Falato claims that he "exhausted [his] administrative remedies." ECF No. 40-3 (referencing verified complaint and attached exhibits). The exhibits, however, do not show that he exhausted his claims. Falato never submitted an informal complaint or grievance that he was not allowed to exercise outside of his cell. He submitted an Informal Complaint about not having outdoor recreation during the COVID lockdown, but he did not file a grievance that was sufficient to meet intake criteria. It is also evident that Falato knew how to properly exhaust administrative remedies under OP 866.1, as he escalated an Informal Complaint to a Regular Grievance related to an issue with his religious diet. Ultimately, because Falato failed to correct the defects of his regular grievance pertaining to outside recreation and completely failed to pursue any grievance about the lack of exercise outside of his cell, he failed to exhaust his administrative remedies. Gibson is entitled to summary judgment on this ground alone.

**2. Eighth Amendment standards**

The Eighth Amendment protects inmates from cruel and unusual punishment and imposes an affirmative obligation on prison officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "Like any other Eighth Amendment claim, an Eighth Amendment conditions of confinement claim has (1) objective components and (2) subjective components." *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019).

To satisfy the objective component an inmate must "demonstrate that the deprivation alleged was objectively, sufficiently serious." *Id.* "To be sufficiently serious, the deprivation must be extreme—meaning that it poses a serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of harm resulting from . . .

exposure to the challenged conditions." *Id.* Put another way, the deprivation must have caused denial of "the minimum civilized measures of life's necessities." *Farmer*, 511 U.S. at 834.

To satisfy the subjective component, "a plaintiff challenging his conditions of confinement must demonstrate that prison officials acted with 'deliberate indifference.'" *Id.* at 361 (citation omitted). A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to an inmate's health or safety." *Farmer*, 511 U.S. at 837. "Put differently, the plaintiff must show that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and drew that inference." *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 211 (4th Cir. 2017). A showing of "mere negligence" is insufficient. *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

The denial of exercise, particularly for an extended period, can give rise to an Eighth Amendment violation. *Mitchell v. Rice*, 954 F.2d 187, 191 (4th Cir. 1992) (explaining that while the denial of out-of-cell exercise opportunities is not *per se* unconstitutional, a "complete deprivation of exercise for an extended period of time violates the Eighth Amendment"). "In considering the totality of the circumstances surrounding the denial of exercise, [the court must] look at the 'overall duration of incarceration, the length of time for which prisoners are locked in their cells each day, and the practical opportunities for the institution to provide prisoners with increased exercise opportunities." *Lyles v. Stirling*, 844 F. App'x 651, 654 (4th Cir. 2021).

It appears undisputed that beginning in December 2021 through the end of August 2022, Falato was not allowed *any* outdoor recreation or outdoor exercise because of the construction project that prevented the use of the interior recreation modules.[3] Also during this time, Falato's

---

[3] Gibson's declaration states that the modules could not be used when outside personnel and equipment were on the roof. Gibson Decl. ¶ 15. However, Gibson does not clarify that the modules could be used, or were used, by Falato at other times. Thus, drawing all reasonable inferences in favor of Falato as the non-moving party, the court presumes that Falato was denied all outdoor recreation during this period.

17

in-unit and out-of-cell recreation time was limited and restricted generally because of his security classification as a Level 6 Re-Entry inmates. It is not clear from the summary judgment record put forth by Gibson how extensive the restrictions were on out-of-cell exercise. Then, there were further restrictions during various COVID outbreaks. For example, during the first COVID outbreak from December 29, 2021, through February 18, 2022, Level 6 Re-Entry inmates were allowed a minimum of one hour of out-of-cell time, regular showers, and the opportunity to use the kiosk and make phone calls seven days a week. Again, based on the evidence provided by Gibson and summarized herein, the extent of out-of-cell exercise restrictions is not precisely established.

Falato, on the other hand, has provided a declaration under penalty of perjury that for nine months, starting on January 3, 2022, he was denied outside recreation and any opportunity to exercise outside of his cell. Falato Decl. ¶ 4, ECF No. 57. Drawing all reasonable inferences in favor of Falato, the court finds that an issue of fact exists about the extent of exercise he was allowed outside of his cell, and this fact issue is material to whether the deprivation of exercise was objectively serious. *See, e.g.*, *Rivera v. Mathena*, 795 F. App'x 169, 175 (4th Cir. 2019) (finding that a two-month deprivation of showers and recreation over a four-year period could be sufficient to support an Eighth Amendment claim).

On the subjective element, however, Falato cannot satisfy this aspect of the deliberate indifference analysis because Gibson did not have any authority to create or change the various policies that restricted Falato's exercise. Gibson did not create VDOC's policy prohibiting Level 6 Re-Entry inmates from having unrestrained outdoor recreation. Neither did he have any involvement in formulating the restrictions resulting from construction activities or COVID outbreaks. The evidence is undisputed that Gibson attempted to secure more exercise time for

Falato and other inmates that were similarly situated, but each time he tried, his efforts were thwarted. Thus, Gibson did not act with deliberate indifference because despite his knowledge of the situation, he did not have "the authority and the ability to correct" the deprivation of exercise. *Springer v. Mathena*, Civil Action No. 7:12cv0074, 2013 WL 3245356, at *4 (W.D. Va. June 26, 2013) (citing *Moore v. Winebrenner*, 927 F.2d 1312 (4th Cir. 1991)); *see also Thayer v. Adams*, 364 F. App'x 883, 891 (5th Cir. 2010) (finding that officers were not deliberately indifferent because they "were not empowered to take action contrary to doctor's orders," and thus "their inability to alleviate" inmate's pain was not "a grievance of constitutional magnitude").

***

Accordingly, because Falato cannot satisfy the subjective element of his Eighth Amendment claim, and also because Falato failed to exhaust his administrative remedies, Gibson is entitled to summary judgment.

**C. Falato's Motion for Summary Judgment**

Falato's summary-judgment motion will be denied based on the analysis the court has already set forth pertaining to Gibson's motion. For instance, Falato is not entitled summary judgment on his Eighth Amendment claim based on the undisputed evidence that Falato did not exhaust his administrative remedies and that Gibson lacked authority to allow Falato outdoor or out-of-cell exercise. Even absent this evidence, there is an issue of fact on the extent of exercise Falato was allowed which would also preclude the entry of summary judgment in his favor.

III. CONCLUSION

For the reasons stated in the foregoing opinion, the court will issue an order granting Gibson's motion for summary judgment, denying Falato's motion for summary judgment, and entering judgment dismissing this case in its entirety.

ENTER: March 8, 2024

Joel C. Hoppe
U.S. Magistrate Judge

20